UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,                  CRIMINAL NO. 92-81127

v.                            HON. DAVID M. LAWSON

JOHN GORDON,

      Defendant.

---

### United States' Response to Defendant's Motion for Compassionate Release

---

John Gordon earned himself a life sentence when he shot and killed Dwight Farrell and Walter Daniels. He participated in a decade-long large scale drug conspiracy that resulted in at least eight homicides. A jury convicted him for conspiracy, intentional killing, and using a firearm in furtherance of drug trafficking. He now moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A) on the basis of his chronic kidney disease. This Court lacks jurisdiction to entertain his motion because his case is currently on appeal. Notwithstanding, his motion should be denied.

This Court lacks jurisdiction to entertain Gordon's motion because the Court of Appeals is currently handling his appeal. (*See* No. 19-1739, *United States v. Gordon*). Regardless, Gordon does not qualify for compassionate release.[1] Gordon's offense, past behavior, and refusal to follow the medical professionals' instructions make him a danger to himself and the community, which precludes release under USSG § 1B1.13(2). And the § 3553(a) factors—which the Court must also consider under § 3582(c)(1)(A)—likewise do not support release.

## Background Information

This defendant involved himself in a dangerous criminal organization known as "Best Friends." *See U.S. v. Polk*, 182 F.3d 919 (6th Cir. 1999) (discussing the facts of this case). After a 32 day trial that included 70 witnesses, the jury convicted Gordon of all counts in the superseding indictment. The district court sentenced Gordon to two counts of mandatory life imprisonment, plus five consecutive years. (R. 1368: Judgment, 14183). Gordon unsuccessfully appealed.

For the next two decades, Gordon continued to file motions to challenge his sentence. This resulted in six trips to the Court of Appeals.

---

[1] It appears that Gordon met the exhaustion requirement by first seeking administrative relief from the Bureau of Prisons.

He currently has an appeal pending that concerns his latest request for reduction in sentence.  *U.S. v. Gordon*, No. 19-1739.

Gordon is currently incarcerated at Devens Federal Medical Center (FMC) in Ayer, Massachusetts.  He is 47 years old.  Gordon suffers from chronic kidney disease, a recognized risk factor for "severe illness" if he were to contract Covid-19.  He has other underlying illness as well, but none of those present recognized risk factors.[2]

Gordon has moved for compassionate release, citing his medical condition and the Covid-19 pandemic. But even if he can show that his underlying medical issue qualifies as an "extraordinary and compelling reason," to grant relief, Gordon cannot overcome the fact that he remains a danger under 18 U.S.C. §3553(a).  His motion should be denied.

---

[2] Gordon's hypertension is considered "essential."  This type of hypertension is not a risk factor.  For a more thorough discussion, please see Declaration of John M. Flack, MD, MPH, FAHA, MACP, FASH, *Malam v. Adducci*, No. 20-10829, E.D. MI, R. 115: Supplemental Exhibit, 3943, filed June 15, 2020).

## Argument

### I.   This Court lacks jurisdiction to review Gordon's motion because he has a pending appeal challenging his sentence.

Gordon has a pending appeal challenging the Court's previous denial of relief under the First Step Act, and his pending appeal deprives the Court of jurisdiction to act here. Filing a notice of appeal transfers adjudicatory authority from the district court to the court of appeals. *United States v. Carman*, 933 F.3d 614, 617 (6th Cir. 2019). Specifically, the filing "confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." *Id.* (citing *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982) (per curiam)); *see also United States v. Holloway*, 740 F.2d 1373, 1382 (6th Cir. 1984).

Filing a notice of appeal with the district court divests the district court of jurisdiction to act in a case, except on remedial matters unrelated to the merits of the appeal. *Fort Gratiot Sanitary Landfill, Inc. v. Mich. Dep't of Natural Res.*, 71 F.3d 1197, 1203 (6th Cir. 1995). Thus, "expansion of a district court's judgment [is] not permitted while an appeal is pending." *NLRB v. Cincinnati Bronze,*

*Inc.,* 829 F.2d 585, 588 (6th Cir. 1987). This general rule applies unless that appeal is untimely; it is an appeal from a non-appealable non-final order; or it raises only issues that were previously ruled upon in that case by the appellate court. *United States v. Williams,* 2006 WL 3203748, at *6 (6th Cir. 2006); *see also Taylor v. KeyCorp,* 680 F.3d 609, 616 (6th Cir. 2012) ("The filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal.") (quoting *Griggs v. Provident Consumer Disc. Co.,* 459 U.S. 56, 58 (1982)). After the filing of a notice of appeal, the district court retains jurisdiction only to enforce the judgment or to "proceed with matters that are in aid of the appeal." *Taylor,* 680 F.3d at 616 n.8 (citations omitted).

This Court lacks jurisdiction over Gordon's present motion because the requested relief here involves matters related to the merits of Gordon's appeal. As other courts have explained in this same context, a pending appeal that involves a defendant's sentence deprives a district court of jurisdiction to rule on the defendant's motion for compassionate release. *United States v. Walls*, No. 92-CR-80236, 2020 WL 1934963, at * 2 (E.D.M.I. Apr. 22, 2020); *United States v. Martin*, No. 18-CR-834-7, 2020 WL 1819961, at *1–*2 (S.D.N.Y. Apr. 10, 2020).

And Gordon's appeal seeks some version of a reduced sentence or outright release from custody. His appeal seeks the same ultimate relief as his most recent motion for compassionate release. The orderly disposition of cases therefore requires waiting for a ruling from the Sixth Circuit before this Court proceeds to rule on any motion seeking to modify Gordon's sentence. The Court should not take any action that could "alter the status of the case as it rests before the Court of Appeals." *Dayton Indep. School Dist. v. U.S. Mineral Prods. Co.*, 906 F.2d 1059, 1063 (5th Cir. 1990), quoted in *United States v. Gallion*, 534 F. App'x 303, 310 (6th Cir. 2013).

## II. Even if this Court could rule on Gordon's motion, it should be denied because the Bureau of Prisons has responded to Covid-19 by protecting inmates and increasing home confinement.

### A. The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.

The Bureau of Prisons has reacted quickly to confront Covid-19's spread within its facilities. For over almost a decade, the Bureau of Prisons has maintained a detailed protocol for responding to a pandemic. Consistent with that protocol, the Bureau of Prisons began planning for Covid-19 in January 2020.

On March 13, 2020, the Bureau of Prisons began modifying its operations to implement its Covid-19 Action Plan and minimize the risk of Covid-19 transmission into and inside its facilities. *See* BOP Covid-19 Modified Operations Website. Since then, as the worldwide crisis has evolved, the Bureau of Prisons has repeatedly revised its plan. To stop the spread of the disease, the Bureau of Prisons has restricted inmate movement within and between facilities. *See id.* Only limited group gathering is allowed, and social distancing is maximized. Staff and inmates are also issued face masks to wear in public areas. *See* BOP FAQs: Correcting Myths and Misinformation.

Every newly admitted inmate is screened for Covid-19 risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are provided with medical evaluation and treatment and are isolated from other inmates until testing negative for Covid-19 or being cleared by medical staff under the CDC's criteria. In areas with sustained community transmission, all staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with other symptoms can be placed on leave by a medical officer.

Other access to the facilities has likewise been restricted. Contractors are only permitted access if performing essential services, and any contractor who requires access is screened for symptoms and risk factors. Social and legal visits have been suspended to limit the number of people entering the facility and interacting with inmates. But to ensure that relationships and communication are maintained throughout this disruption, the Bureau of Prisons has increased inmates' telephone allowance to 500 minutes per month. Legal visits are permitted on a case-by-case basis after the attorney has been screened for infection.

Like all other institutions, penal and otherwise, the Bureau of Prisons has not been able to eliminate the risks from Covid-19 completely, despite its best efforts. But the Bureau of Prisons' measures will help federal inmates remain protected from Covid-19 and ensure that they receive any required medical care during these difficult times.  As of June 30, 2020, the Devens FMC has 923 inmates, with 19 (or, .02%) positive Covid-19 cases.  One staff member recently tested positive.

**B.**     **The Bureau of Prisons is increasing the number of inmates who are granted home confinement.**

The Bureau of Prisons has also responded to Covid-19 by increasing the placement of federal prisoners in home confinement. New legislation now temporarily permits the Bureau of Prisons to "lengthen the maximum amount of time for which [it] is authorized to place a prisoner in home confinement" during the Covid-19 pandemic. Coronavirus Aid, Relief, and Economic Security Act (CARES Act) § 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020). The Attorney General has also issued two directives, ordering the Bureau of Prisons to use the "various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing Covid-19 pandemic." (03-26-2020 Directive to BOP, at 1; *accord* 04-03-2020 Directive to BOP, at

1). The directives require the Bureau of Prisons to identify the inmates most at risk from Covid-19 and "to consider the totality of circumstances for each individual inmate" in deciding whether home confinement is appropriate. (03-26-2020 Directive to BOP, at 1).

The Bureau of Prisons' efforts on this point are not hypothetical. Over 4,316 federal inmates have been granted home confinement since the Covid-19 pandemic began, and that number continues to grow. BOP Coronavirus FAQs. As the Attorney General's directives have explained, these home-confinement decisions have required evaluating several criteria:

> 1.) Each inmate's age and vulnerability to Covid-19;
>
> 2.) Whether home confinement would increase or decrease the inmate's risk of contracting Covid-19; and
>
> 3.) Whether the inmate's release into home confinement would risk public safety.

(03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP).

These criteria not only make sense, but also fit the realities of the Covid-19 pandemic far better than any other solution does. The Bureau of Prisons cannot open its facilities' gates indiscriminately and unleash tens of thousands of convicted criminals, en masse. It must focus on the inmates who have the highest risk factors for Covid-19 and are least

likely to engage in new criminal activity. This is true not just to protect the public generally, but to avoid the risk that a released defendant will bring Covid-19 back into the jail or prison system if he violates his terms of release or is caught committing a new crime. *See* 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2). The Bureau of Prisons' home-confinement initiative thus appropriately focuses on the inmates who will most benefit from release and whose release is least risky.

The Bureau of Prisons must also balance another important consideration: how likely is an inmate to abide by the CDC's social-distancing protocols or other Covid-19-based restrictions on release? If a prisoner would be unlikely to take release conditions or Covid-19 precautions seriously, he would also be far more likely than the general public to contract and spread Covid-19 if released.

Finally, the Bureau of Prisons' home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and circumstances that are most urgent. For any inmate who is a candidate for home confinement, the Bureau of Prisons must first ensure that his proposed home-confinement location is suitable for release, does not place him at an even greater risk of contracting Covid-19, and does not place

members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to health care and other resources. It must consider myriad other factors, including the limited availability of transportation right now and the probation department's reduced ability to supervise inmates who have been released. All of those decisions require channeling resources to the inmates who are the best candidates for release.

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the Bureau of Prisons to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino*, No. 18- 20451, 2020 WL 1676766, at *6 (E.D. Mich. Apr. 6, 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of Prisons."). It is especially true now, given the Bureau of Prisons' substantial and ongoing efforts to address the Covid-19 pandemic.

## III.   Even if this Court had jurisdiction to entertain Gordon's motion, it should deny Gordon's motion for compassionate release.

Gordon's motion for compassionate release should be denied. A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Quite the contrary: a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

He must show "extraordinary and compelling reasons" for compassionate release, and release must be "consistent with" the Sentencing Commission's policy statements. 18 U.S.C. § 3582(c)(1)(A). As with the identical language in § 3582(c)(2), compliance with the policy statements incorporated by § 3582(c)(1)(A) is mandatory. *See Dillon v. United States*, 560 U.S. 817 (2010); *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). To qualify, a defendant must have a medical

condition, age-related issue, family circumstance, or other reason that satisfies the criteria in USSG § 1B1.13(1)(A) & cmt. n.1, and he must "not [be] a danger to the safety of any other person or to the community," USSG § 1B1.13(2).

But even if a defendant is eligible for compassionate release, the district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13. As at sentencing, those factors require the district court to consider the defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. § 3553(a).

### A. Even if Gordon's medical condition is an "extraordinary and compelling reason" to grant compassionate release, he is ineligible due to his dangerousness.

Compassionate release must be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). Congress tasked the Sentencing Commission with "describ[ing] what should be considered extraordinary and compelling reasons for [a] sentence reduction" under § 3582(c)(1)(A), as well

developing "the criteria to be applied and a list of specific examples" for when release is permitted. 28 U.S.C. § 994(t).

Because the Sentencing Commission has fulfilled Congress's directive in USSG § 1B1.13, that policy statement is mandatory. Section 3582(c)(1)(A)'s reliance on the Sentencing Commission's policy statements mirrors the language governing sentence reductions under 18 U.S.C. § 3582(c)(2) for retroactive guideline amendments. *Compare* § 3582(c)(1)(A) *with* § 3582(c)(2). When Congress uses the same language in the same statute, it must be interpreted in the same way. *Marshall*, 954 F.3d at 830. In both contexts, then, the Sentencing Commission's restraints "on a district court's sentence-reduction authority [are] absolute." *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014); *accord Dillon v. United States*, 560 U.S. 817, 830 (2010).

The First Step Act did not change that. It amended only *who* could move for compassionate release under § 3582(c)(1)(A). It did not amend the substantive requirements for release. *United States v. Saldana*, No. 19-7057, 2020 WL 1486892, at *2–*3 (10th Cir. Mar. 26, 2020); *United States v. Mollica*, No. 2:14-CR-329, 2020 WL 1914956, at *4 (N.D. Ala. Apr. 20, 2020). Section 1B1.13 remains binding.

Section 1B1.13 cabins compassionate release to a narrow group of non-dangerous defendants who are most in need. That policy statement limits "extraordinary and compelling reasons" to four categories: (1) the inmate's medical condition; (2) the inmate's age; (3) the inmate's family circumstances; and (4) other reasons "[a]s determined by the Director of the Bureau of Prisons," which the Bureau of Prisons has set forth in Program Statement 5050.50. USSG § 1B1.13 cmt. n.1. As the Tenth Circuit recently explained, a district court "lack[s] jurisdiction" to grant compassionate release when a defendant's circumstances do not fall within those categories. *Saldana*, 2020 WL 1486892, at *3.

The Covid-19 pandemic does not, by itself, qualify as the type of inmate-specific condition permitting compassionate release. The Bureau of Prisons has worked diligently to implement precautionary measures reducing the risk from Covid-19 to Gordon and other inmates. Thus, as the Third Circuit has explained, "the mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *Raia*, 954 F.3d at 597. But the

Department of Justice recognizes that certain, recognized medical conditions like Gordon's, meet the medical condition outlined by the USSG § 1B1.13.

Even if the combination of Gordon's medical conditions and the Covid-19 pandemic satisfied the initial criteria for eligibility in USSG § 1B1.13 cmt. n.1, Gordon would remain ineligible for compassionate release because he is a danger to the community. Section 1B1.13(2) only permits release if a "defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." It thus prohibits the release of violent offenders, including most drug dealers. *See United States v. Stone*, 608 F.3d 939, 947–48 & n.6 (6th Cir. 2010). It also bars the release of many other defendants. An evaluation of dangerousness under § 3142(g) requires a comprehensive view of community safety—"a broader construction than the mere danger of physical violence." *United States v. Cook*, 880 F.2d 1158, 1161 (10th Cir. 1989) (per curiam).

Adhering to § 1B1.13(2) is especially important given the current strain on society's first responders and the rise in certain types of crime during the Covid-19 pandemic. Police departments in many cities have been stretched to their limits as officers have either contracted Covid-19

or been placed in quarantine. Some cities, including Detroit, have seen [spikes in shootings and murders](). Child sex predators have [taken advantage]() of bored school-aged kids spending more time online. [Covid-19-based fraud schemes]() have proliferated. There are real risks to public safety right now, and those risks will only increase if our community is faced with a sudden influx of convicted defendants.

Gordon has a medical condition that puts him at higher risk for a more serious outcome should he contract Covid-19. (Exhibit A: BOP Medical Records and Information).  But, aside from his dangerousness (discussed below), releasing Gordon to the community would likely not decrease his risk of contracting Covid-19.  That is because, even in the most controlled circumstances, Gordon refuses to adhere to medical advice.  Over the years, and ramping up in recent weeks after filing for compassionate release, Gordon has refused lab tests, the flu shot, doctors' orders, and taking his blood pressure medication.  He even refused to go the emergency room recently.  (Exhibit B: Summary of Medical Refusal).  His records outline a history of non-compliance, including refusal to maintain basic sanitary procedures.  And if Gordon cannot control his medical issues while under the strict supervision in the BOP medical facility, how

can he be considered a lesser risk at home, where he would be solely responsible for obtaining his own treatment?

Because Gordon's release would endanger the community, § 1B1.13(2) prohibits reducing his sentence under § 3582(c)(1)(A). Gordon is not eligible for compassionate release.

### B.   The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.

Even when an inmate has shown "extraordinary and compelling reasons" and demonstrated that he is not dangerous, he is still not entitled to compassionate release. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that release is appropriate. *See United States v. Austin*, No. 15-20609, 2020 WL 2507622, at *3–*5 (E.D. Mich. May 15, 2020) (holding that the "[d]efendant's circumstances do not warrant compassionate release . . . under 18 U.S.C. § 3553(a)"); *United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *6 (E.D. Mich. May 15, 2020) (denying compassionate release because "the 18 U.S.C. § 3553(a) sentencing factors do not favor release"); *see also United States v. Kincaid*, 802 F. App'x 187, 188–89 (6th Cir. 2020) (upholding a district court's denial of compassionate release based on the § 3553(a) factors). So even if the Court were to find Gordon

eligible for compassionate release, the § 3553(a) factors should still disqualify him.

The nature and circumstances of the offense are quite serious.  This defendant involved himself a dangerous, violent organization that reigned terror on the community for years.  For his part, Gordon seemed unafraid to be the one on the front lines.  Indeed, he murdered at least two people.  The passage of time should not diminish the memory of the victims and their families, nor should the passage of time lessen the seriousness of Gordon's actions.  The history and characteristics of this defendant also warrant a denial of his request.  Gordon flatly denied his conduct at sentencing. (See R. 1610: Sent. Tran., PgID 6902) ("I would like to say I didn't do any of these crimes. I would like to say I didn't murder. And I didn't kill.").  Now, years later, Gordon has yet to take the recommended anger management classes that BOP suggested for him. (Exhibit A: BOP Medical Records and Information).

Congress determined that crimes like intentional murder should carry a mandatory life sentence.  This is in line with virtually every state's punishment for first degree homicide.   Gordon's kidney disease—a

condition he refuses to properly manage—should not sway this Court to release a man that is responsible for multiple homicides.

## IV.    The United States requests a stay of any release order.

If the Court were inclined to grant Gordon's motion despite the government's arguments above, the government requests that the parties be notified sufficiently in advance for the government to determine whether it will seek an emergency stay pending a possible appeal to the Sixth Circuit.

## Conclusion

Gordon's motion should be denied.

Respectfully submitted,

MATTHEW SCHNEIDER,
United States Attorney

s/Margaret M. Smith
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
Phone:  (313) 226-9135
E-Mail: margaret.smith@usdoj.gov
Bar No. P71413

Dated:  July 1, 2020

## Certificate of Service

I hereby certify that on July 1, 2020, I electronically filed the United States' Response to Defendant's Motion for Compassionate Release with the Clerk of the Court of the Eastern District of Michigan using the ECF system which will send notification of such filing to the following via electronic mail:

Douglas R. Mullkoff
doug@kmhlaw.com

s/Margaret M. Smith
MARGARET M. SMITH (P71413)
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
Phone:  (313) 226-9135
E-Mail: margaret.smith@usdoj.gov